MICHAEL O'CONNOR et al.

v.

MARGARET MAHONEY et al.

*Filed at Ottawa November 1, 1895.*

1. NOTICE—*is what diligence and inquiry would have revealed.* A purchaser of real estate who has knowledge of such facts respecting the title as would lead an honest man using ordinary caution to make further inquiry, is chargeable with notice of such facts as, by the use of ordinary diligence, he might have learned.

2. STATUTE OF FRAUDS—*when agreement to hold property for another is not within.* An agreement to hold the title of property for the benefit of one for whom it is redeemed from foreclosure sale is not within the Statute of Frauds.

3. EVIDENCE—*certificate of evidence in chancery competent on later trial.* A certificate of evidence in chancery, being part of the record for all purposes of the litigation and for the support and preservation of the decree, may be read in evidence on a later trial of the same case. (PHILLIPS, J., dissenting.)

APPEAL from the Superior Court of Cook county; the Hon. WILLIAM G. EWING, Judge, presiding.

BOTSFORD & WAYNE, and RUDOLPH D. HUSZAGH, for appellant:

The certificate of evidence prepared by Judge Gardner was improperly admitted and read in evidence. *Flaherty* v. *McCormick,* 123 Ill. 525.

The law is well settled in this State that it is error for a court to permit an attorney to read from the bill of exceptions, over the objection of the opposing party, testimony of a witness given upon a former trial. *Roth* v. *Smith,* 54 Ill. 431; *O'Neal* v. *Calhoun,* 67 id. 219; *Stern* v. *People,* 102 id. 540; *Railroad Co.* v. *Horan,* 131 id. 288; *Asher* v. *Mitchell,* 9 Ill. App. 335.

Even where depositions are taken *de bene esse,* they are not used if the witness is alive and able to testify when the issue is tried, but he is examined in the cause like any other witness. 2 Beach on Modern Eq. Jur. 1090.

Appellant O'Connor was a *bona fide* purchaser for a valuable consideration, and without notice of the voidable character of the title bought by him or of any equitable rights of the complainants.   *Sloan* v. *Graham*, 85 Ill. 26; *Ebelmesser* v. *Ebelmesser*, 99 id. 541; *Robbins* v. *Bates*, 4 Cush. 104; *Wyman* v. *Hooper*, 2 Gray, 141; *Read* v. *Howe*, 39 Iowa, 553; *Blood* v. *Haymen*, 13 Metc. 231; *Ives* v. *Ashley*, 97 Mass. 198; *King* v. *Cabaniss*, 81 Ga. 661.

Where one was guilty of actual fraud in obtaining title to land, but had conveyed the land to a *bona fide* purchaser for a valuable consideration, without notice of the fraud, such purchaser nevertheless had a valid title as against the first grantor.   *Somes* v. *Brewer*, 2 Pick. 184; *Allison* v. *Drake*, 145 Ill. 500; *Prevo* v. *Walters*, 4 Scam. 35.

It is the cherished object of courts to give stability to judicial sales, and they will not be interfered with, except where wrong and injustice have been done.   *Dingledine* v. *Hershman*, 53 Ill. 280; *Goudy* v. *Hall*, 36 id. 313; *Allman* v. *Taylor*, 101 id. 185.

A purchaser at such sale has only to see that the court had jurisdiction, and that the decree authorized the same, and is unreversed.   *Fergus* v. *Woodworth*, 44 Ill. 374; *Buckmaster* v. *Carlin*, 3 Scam. 104; *Horner* v. *Zimmerman*, 45 Ill. 14; *Mulford* v. *Stalzenback*, 46 id. 303; *Conover* v. *Musgrave*, 68 id. 58; *Wilson* v. *Kellogg*, 77 id. 47.

Notice to charge a subsequent purchaser must be clearly proved.   *Pittman* v. *Sofley*, 64 Ill. 155.

Unless O'Connor had notice of the equitable title of complainants he should be protected against them.   *Moore* v. *Hunter*, 1 Gilm. 317; *Robbins* v. *Moore*, 129 Ill. 43.

O'Connor was not required to look for latent defects. *Robbins* v. *Moore*, 129 Ill. 30; *Mettler* v. *Craft*, 39 Ill. App. 210.

The fact that complainants were living upon a part of the premises with their mother was not such possession as would have charged O'Connor with notice of their equitable rights.   *Harris* v. *McIntyre*, 118 Ill. 275.

The possession of complainants, to afford notice of their rights, must have been exclusive. *Smith* v. *Heirs of Jackson*, 76 Ill. 254.

Possession, to be notice, must be of such a character as in its nature is calculated to arrest the attention and put a person about to acquire title upon inquiry. *Truesdale* v. *Ford*, 37 Ill. 210.

A party is not chargeable with notice of facts within the knowledge of his attorney, which the latter acquired while acting as the attorney of another person. *McCormick* v. *Wheeler*, 36 Ill. 116; *Herrington* v. *McCollum*, 73 id. 477.

Duncan & Gilbert, for appellees:

A party must be taken to have notice of those facts which, if he had used ordinary diligence, he would readily have ascertained. *Whitbread* v. *Jordan*, 1 Y. & C. Ex. 303; *Hankinson* v. *Barker*, 29 Ill. 80; *McVey* v. *McQuality*, 97 id. 93.

Equity will not allow a statute designed to prevent frauds to be made an instrument for committing them, and it will give relief where a wrongful advantage has been fraudulently obtained by means of the statute. 8 Am. & Eng. Ency. of Law, 737; *Seaman* v. *Ascherman*, 51 Wis. 678; Story's Eq. Jur. secs. 754, 757, 759; *Campbell* v. *Dearborn*, 109 Mass. 130; *Lantry* v. *Lantry*, 51 Ill. 458.

The evidence embodied in the certificate of evidence by Judge Gardner was properly admitted. *Flaherty* v. *McCormick*, 123 Ill. 525.

Mr. Justice Bailey delivered the opinion of the court:

This was a bill in chancery, brought by Edward, Margaret, Mary and Honore Mahoney, children and heirs-at-law of Timothy Mahoney, deceased, against Bridget Mahoney, their mother, Michael O'Connor and other defendants, to set aside an administrator's sale of certain lots of land in the city of Chicago claimed by them as heirs of their deceased father, and certain subsequent conveyances thereof. The defendants answered, and the

cause being heard on pleadings and proofs before the late Judge Gardner, the equities of the case were found to be with the defendants, and a decree was entered dismissing the bill at the complainants' costs. The record was afterwards removed to this court by writ of error, and in this court O'Connor, to the assignments of error, pleaded the Statute of Limitations. To that plea the plaintiffs in error filed a replication, to which O'Connor demurred, and the demurrer being overruled, final judgment was entered in this court reversing the decree as upon errors confessed, without any adjudication by this court of the errors assigned upon the record, and the case was remanded to the Superior Court for further proceedings. (*Mahony* v. *Mahony*, 139 Ill. 14.) After the case was reinstated in the Superior Court it was heard a second time before Judge Ewing, the second hearing being upon the evidence appearing in the certificate of evidence filed at the first hearing and signed by Judge Gardner, that being all, or substantially all, the evidence introduced at the second hearing. Upon that hearing the court found the equities to be with the complainants, and rendered a decree in their favor, in accordance with the prayer of the bill. That decree is now brought to this court by appeal.

The use of the certificate of evidence signed by Judge Gardner, on the hearing before Judge Ewing, was strenuously objected to by defendant O'Connor, and the propriety of its use constitutes one of the questions presented upon this appeal.

It appears that Timothy Mahoney departed this life intestate November 1, 1872, leaving him surviving Bridget Mahoney, his wife, and the four complainants, his children and only heirs-at-law, his children then being minors. At the time of his death he was the owner in fee of three lots of land in the city of Chicago, which are now subject to this litigation. On January 22, 1875, Bridget Mahoney was appointed administratrix of his estate by the county court of Cook county, and proceeded to admin-

ister the same.   On April 28, 1875, she filed her petition for leave to sell the real estate of her intestate to pay debts, the principal, if not the only, claim against the estate then outstanding being the widow's award for $1000 previously allowed her by the court.   In pursuance of her petition an order was entered by the court authorizing and empowering her to advertise and make sale of the land in question for the payment of debts, and on August 3, 1875, she sold the property at administrator's sale to Thomas Keane, her brother-in-law, he bidding $1500 and becoming the purchaser thereof, and a deed of the land was executed to him by her, as administratrix.

The evidence, we think, clearly establishes the fact that Keane became the purchaser of the land in the interest of Mrs. Mahoney, upon an understanding that he was to hold it for her benefit.   To raise the purchase money, Keane executed a trust deed on the land to secure the payment of $1500 borrowed by him, Lester D. Swezey being the trustee, with Joseph R. Bonfield his successor in trust.   From the money thus raised, the widow's award, and perhaps some of the debts, were paid, and from the money which she received the widow paid Keane $400 which she was owing him.   On January 12, 1877, Keane deeded the property to Mrs. Mahoney, the consideration expressed in the deed being $3000, but no consideration in fact being paid.

On March 1, 1878, Bridget Mahoney executed a second trust deed to L. D. Swezey, to secure an additional sum of $2000.   This was done for the purpose of raising money to pay off the first deed of trust and accrued interest, and some other matters.   Swezey, however, failed to procure the money, and subsequently left the country without having had this second trust deed canceled, so that the records showed two trust deeds,—one for $1500 and the other for $2000,—as apparently valid liens upon the property.   Some time during the year following, Mrs. Mahoney, being distressed by this situation of affairs and being

anxious to protect herself against this last $2000 deed of trust, applied to the defendant Michael O'Connor to assist her out of her difficulty. O'Connor, as the evidence tends to show, took her to M. J. Dunne, Esq., an attorney at law, informing her that Dunne was an honest man and would help her. Dunne, having investigated the facts, came to the conclusion that the best way to get rid of the second deed of trust was to cause a foreclosure and sale to be made, by advertisement, under the first deed of trust, and by Dunne's advice, and with the co-operation of the holders of the note, a foreclosure and sale were had November 4, 1879, Bonfield, the successor in trust, acting in the proceedings in place of Swezey, the trustee, who was absent, and at the foreclosure sale the property was struck off and sold to James Mackey for the amount of the indebtedness secured by the first deed of trust, it being then about $1653. Shortly after the sale the·successor in trust executed a deed to Mackey, and at the same time Mrs. Mahoney also executed a deed conveying her interest in the property to him. The evidence tends to show that at the time these transactions were had a contract was executed by Mackey to O'Connor for the· conveyance of the premises to the latter upon payment of the amount of Mackey's bid, with interest, within a certain time fixed by the contract. That amount having been paid, Mackey, on May 1, 1880, executed to O'Connor a deed to the premises for an expressed consideration of $3000, the actual consideration being only $1683.85. At the time Mackey purchased at the foreclosure sale there seems to have been an agreement on his part to hold the premises for one year, and permit Mrs. Mahoney to re-deem by paying the amount which he, Mackey, had paid out. After the conveyance by Mackey to O'Connor the latter executed a lease of a part of the premises to Mrs. Mahoney. She and her children were then, as they were at the time of the death of Timothy Mahoney and as they have been ever since, residing upon the property. O'Con-

nor, at the time of the conveyance to him, seems to have taken possession of the residue of the property not leased to Mrs. Mahoney, and since then has held possession thereof, claiming to own the entire property in fee.

On February 23, 1883, one of the complainants having reached his majority and three of them being still minors, the present bill was filed, alleging, among other things, that the sale by Bridget Mahoney to Thomas Keane, being made in the interest and for the benefit of the administratrix, was in effect a sale to herself, and was therefore voidable at the instance of the complainants; that O'Connor, at the time he took title to the property, had notice of the complainants' rights, and he must therefore be charged as trustee for the complainants.

The principal question of fact litigated at the hearing was, whether O'Connor became the purchaser of the property for a valuable consideration, in good faith and without notice of the rights of the complainants. If he did, upon well recognized principles of equity his title must prevail over that of the complainants. But if, at the time he purchased, he knew or was chargeable with notice of the complainants' rights, his title must be held to be subordinate to theirs, and he must be held to have taken the property as trustee for their benefit.

At the last hearing in the court below Judge Ewing filed in support of his decision an opinion devoted mainly to a discussion of the question whether, under the evidence, O'Connor can be held to have taken the property as a *bona fide* purchaser for value, without notice, and we cannot do better than adopt his discussion of that question as satisfactory:

"Complainants' contention is, that O'Connor, as a mere friendly act and for the sole purpose of aiding Mrs. Mahoney, redeemed this property from the lien thereon held by Mackey and took the title as mortgagee, precisely as Mackey held it. The question to be determined is, is O'Connor the owner of this property by purchase for a

valuable consideration, in good faith and without notice of the rights of complainants?

"Doubtless it is and should be the policy of the law to justify confidence in title to realty apparently good on the face of the record, and where it is sought to defeat such a title on the ground of notice of complainants' equities at the time the legal title was acquired, the evidence of such notice must be so conclusive as to leave no reasonable doubt of the fact of notice; and yet the law is equally well settled, that when a purchaser of real estate has knowledge of such facts respecting the title as would lead an honest man, using ordinary caution, to make further inquiry, and does not do so, he is chargeable with notice of such facts as by the use of ordinary diligence he might have learned. From all the evidence it is inferable that O'Connor knew, by his association and conference with Mrs. Mahoney, Dunne and others, that this property was the same of which Timothy Mahoney died seized, leaving Mrs. Mahoney, his widow, and the complainants, his heirs-at-law, and that the family, prior to and since the death of Mahoney, occupied said property as a homestead. O'Connor also presumably knew (for Mrs. Mahoney says they talked the whole matter over before Dunne) of the sale by the administratrix to Keane for a merely nominal price, and the re-conveyance by Keane, without any consideration in fact, to Mrs. Mahoney in her own right, and that the mortgage for $1500 was placed thereon by Keane to raise the purchase money.

"In view of the fact that Dunne was the attorney and adviser of both O'Connor and Mrs. Mahoney, it is easy of belief that O'Connor was as fully advised respecting the whole history of this property as Mrs. Mahoney. It is not probable that Dunne, a careful, painstaking, conscientious lawyer, would advise O'Connor to invest his means in this property without advising him of all the facts within his own knowledge affecting the title; and if O'Connor was so advised he had such notice of the com-

plainants' equities as should render his title subservi-
ent thereto. But, outside of this source of information,
O'Connor was bound to take notice of all the facts sug-
gested by the record of title, the physical condition and
occupancy of the property, and doing so he had informa-
tion enough to prompt him to such further reasonable in-
quiry as, if made, would have advised him of the equities
complainants now assert. *McVey* v. *McQuality*, 97 Ill. 93.

"By all the evidence I am impressed with the convic-
tion that O'Connor not only had notice of complainants'
equities, but that he agreed to, or at least led Mrs. Maho-
ney to believe that he had agreed to, and would, take the
title to this property and hold it simply as security for
moneys advanced by him upon it. No other conclusion is
consistent with the personal and professional integrity
of Dunne, and I believe him to be an honest and conscien-
tious man.

"When O'Connor made his debut in this transaction,
the only source of anxiety to Mrs. Mahoney was the
second mortgage for $2000, which fraudulently appeared
upon the record as an encumbrance upon this property;
he then expressed his sympathy for her—said he would
help her, and took her to the office of his attorney, Dunne,
where he says both Mrs. Mahoney and Dunne asked him
to bid in the property under the first mortgage sale, 'but
not for her—just to bid it in,' which he declined to do, but
says that Dunne, several days after the sale to Mackey,
figured up the rents, etc., and satisfied him that it was a
good bargain for him to take the property from Mackey;
that he talked with his folks about the trade, and went
back and agreed with Dunne to buy it. He further says
that he made no contract in writing with Mackey to buy
it; that he did not speak to Mackey about it, and would
not know Mackey if he should see him; that it was Mr.
Dunne who made the contract with Mackey; that he
bought the property for himself and refused to take it in
any other way; that a day or two after the purchase Mrs.

Mahoney told him she had no interest in the premises; that he gave her a year's lease of the little house in the rear, as he had made a good trade. He also loaned her in money, coal and wood, about $230 or $240. He moved the house Mrs. Mahoney lived in onto the rear lot, 'because Mr. Dunne entreated me to give her the lot and house; then she said she was well satisfied.' O'Connor testifies: 'I promised Mrs. Mahoney to give her a deed of the rear lot. That was the understanding when I got my deed. I asked Mrs. Mahoney if she had any interest after I had purchased it, because I thought she might, and I wanted to see if she had. I did not know as she understood about my purchase, and she said she did; she said she had no interest in the lots.' And he further says: 'I told her when she signed the deed, that if she found a suitable place I would give her $400, and at the same time I told Mrs. Mahoney I would give her a deed to the rear lot.'

"Clearly, the contract made with Mackey by O'Connor for the purchase of this property was at least supplemented by O'Connor's agreement to pay Mrs. Mahoney $400 and convey to her the rear lot of these premises. The testimony of Dunne is to the effect that before and after the sale to Mackey he urged O'Connor to take this property and hold it for the benefit of Mrs. Mahoney, but that O'Connor refused to take the title in trust or upon the terms that Mackey was holding it, and did buy it for himself. Huszagh, a lawyer occupying an office adjoining Dunne's, says that he overheard a conversation in Dunne's office between O'Connor, Dunne and Mrs. Mahoney, in which O'Connor said that 'he would not take the property in trust, or give a declaration of trust, or make any writing.' It also appears from several witnesses that Mrs. Mahoney, on one or two occasions, said the property was O'Connor's, and expressed gratitude for his generosity and aid.

"As opposed to this evidence it is proper to consider the sole purpose of Mrs. Mahoney's interview with O'Connor and their visit to Dunne, which was to avoid the second deed of trust and save the property to Mrs. Mahoney. This is what Mrs. Mahoney sought O'Connor's aid for; this is what O'Connor took Mrs. Mahoney to Dunne for; this is what Mrs. Mahoney employed Dunne to do and is what Dunne engaged to do. Dunne, as a lawyer, knew that there was no actual danger to this property from the second deed of trust. He knew, also, that there was no pressure for payment of the money secured by the first deed of trust, and that therefore there was no occasion for the foreclosure of the first deed of trust, unless it would have the effect, not only of cutting out the second mortgage, but would also preserve Mrs. Mahoney's equity in the property, and with this object in view Dunne advised the foreclosure proceedings, and induced Mackey to bid in the property and hold the title subject to redemption by Mrs. Mahoney at any time within one year, and on the same day Mackey got the title he entered into a written contract, by the procurement of Dunne, to convey the property to O'Connor at any time within one year upon receipt of his advances. It does not occur to me that Dunne would have secured this contract from Mackey unless he had received assurances from O'Connor that he would take the property on terms at least as favorable to Mrs. Mahoney as she had under the agreement with Mackey, nor is it probable that Dunne would advise, and indeed procure, an absolute sale of this property from Mackey to O'Connor some six months before the time given Mrs. Mahoney for redemption had expired, and thereby foreclose all her rights in the matter, and leave, as the result of the whole transaction, so far as Mrs. Mahoney was concerned, the payment of a $1500 incumbrance with $5000 worth of property. Such a conclusion is not in harmony with Dunne's well established reputation as an honest man and a good lawyer.

"Nor can I reconcile O'Connor's anxiety to have another deed from Mrs. Mahoney to two of these lots upon his conveying to her the title to the third lot as consistent with his absolute ownership of the whole property, while his solicitude in this regard is entirely in harmony with complainants' contention that he held the title as a mortgagee; and this contention is greatly fortified by the testimony of other witnesses.

"Bridget Mahoney says: 'Mackey bought the property at the foreclosure sale. I had an arrangement with him that he was to hold the title for me for a year. About the time the mortgage was foreclosed O'Connor came to my house and spoke to me about it. He said he heard of Mr. Wren being around, and that if they were going to foreclose the mortgage he would help me out of it. He asked me if I had any lawyer. I said 'No,' and he spoke to me of M. J. Dunne,—said he would go with me to Mr. Dunne's office any day I appointed. We went to Mr. Dunne and told him all about it, and he worked for me then, and Mr. O'Connor was my friend, as I thought. Mr. Dunne said O'Connor was a good man to hold the property for me; that he lived close to there and could collect the rent and pay the expenses. Mr. O'Connor said he would do all he could for me; that he would raise $500 on his lot before he would see me lose my place. O'Connor bought the property in his own name to hold for me. He said if there was any other man I liked better than I did him,—that I would rather have at the end of a year or so,—that I could get him at any time. So I told him I was satisfied with him holding it for me.'

"Daniel F. Wren, testified: 'I purchased the $1500 mortgage made by Keane to Swezey for my brother-in-law, McCarthy, and Mrs. Mary Buckley, my sister. Swezey run away from town and the interest was not paid. I went to see Mrs. Mahoney, and she got Mr. O'Connor, a friend of hers. I then learned of a second mortgage, and told her I would do what I could to protect her against

it.   Mr. M. J. Dunne was the attorney for O'Connor and
Mrs. Mahoney.   We all tried to help the widow because
she was being robbed on the second mortgage.   Mrs.
Mahoney said O'Connor was a neighbor and a good man,
regularly attending to his religious duties.   Mr. O'Connor
explained to me how this woman was imposed upon by
Swezey and how he was willing to help her out of a
scrape.   We were all trying to get out of Swezey's mort-
gage, and acted under the advice of Mr. Dunne, as attor-
ney for Mrs. Mahoney and O'Connor.   Mr. O'Connor said
he would hold the title long enough to let this thing cool
off, and then turn over the title to whoever Mrs. Mahoney
wanted.   I took no more interest in Mrs. Mahoney than
in any woman I thought was being robbed.   The agree-
ment with O'Connor was all verbal.   The arrangements
with him were to be kept in the dark.   The whole thing
was to cut off the second mortgage and get it (the prop-
erty) into her friend O'Connor's hands to protect her.'

"Daniel McCarthy testified: 'I knew about the transfer
of this property from John Mackey to Michael O'Connor.
I was present when it took place in Mr. Dunne's office.
The conversation I heard between O'Connor, Dunne and
Mrs. Mahoney was, that O'Connor should take the prop-
erty and hold it for Mrs. Mahoney.'

"Hanora Burroughs testifies:   'I had a conversation
two years ago with O'Connor in reference to the title to
this property.   He said:   'I intend to do justice to Mrs.
Mahoney, and although some people have said why not
take that place yourself, I answered how would they like
to be left on the roadside.   Mrs. Burroughs, when I got
that place in charge from Mrs. Mahoney I had it written
in black and white, and if I should drop dead it would be
hers and her children's.'

"I cannot escape the conclusion that in addition to
both constructive and actual notice of complainants'
rights there was an agreement on the part of O'Connor
to hold the title of this property for the benefit of Mrs.

159—6

Mahoney, and although this agreement was a verbal one I do not believe it comes within the Statute of Frauds, but is brought, by all the facts and circumstances in evidence, within that class of cases in which the fact may be established by parol. *Reigard* v. *McNeil*, 38 Ill. 400; *Smith* v. *Doyle*, 46 id. 451."

Adopting the conclusions of the learned judge of the Superior Court, it follows that O'Connor took title to the land as trustee for the complainants, and that they are entitled to have the same conveyed to them, and to have an accounting with O'Connor in relation to rents and profits received by him during the time he has been in possession. The decree of the court awarded such conveyance and accounting, and the accounting being had, it was found that there was due from O'Connor to the complainants the sum of $3773.15, and he was decreed to pay that sum to the complainants.

In the accounting O'Connor was entitled to be credited with the moneys paid by him for the land, and also the amount paid on account of the taxes, repairs and other necessary expenditures, and he was liable to be charged with the rents and profits received from the premises, interest to be computed at the rate of six per cent per annum to July 1, 1891, and thereafter at five per cent per annum. Counsel for O'Connor insist that the amount found due upon the accounting is too large, but they fail to point out any item improperly charged against their client, or any respect in which the accounting was not had upon the principles above stated. Under these circumstances we shall not attempt to re-state the account, but must assume that it has been properly stated, and that the true result is the one fixed by the decree.

We are unable to see that any error was committed in reading in evidence at the second hearing the certificate of evidence signed by Judge Gardner at the first trial. The only decisions referred to by counsel in support of their contention in this respect are those in which it is

held that in actions at law it is erroneous to read in evidence the bill of exceptions taken at a former trial of the case, against the objection of the opposite party. Decisions of that character have no application. While there is some analogy between certificates of evidence in chancery and bills of exceptions at law, still they are governed by essentially different rules. Bills of exceptions are prepared merely for the purpose of presenting the proceedings and evidence at the trial for review on appeal or writ of error, and when that object is accomplished they are *functus officio*. Not so, however, with certificates of evidence in chancery. They become part of the record for all purposes. When the evidence is embodied in such certificate it remains a part of the record for all purposes of the litigation and for the support and preservation of the decree. We think it was proper, therefore, to read the evidence as it appeared in the certificate on file.

We find no error in the record, and the decree will therefore be affirmed.

*Decree affirmed.*

Mr. JUSTICE PHILLIPS: I concur in the conclusion reached, but not in all that is said in the opinion as to a certificate of evidence made at a former trial being competent evidence on re-trial of the same case. Where the certificate embodies the testimony, in form of questions and answers taken as the deposition of the witness, it would, in my opinion, be competent; but where the substance of the testimony only is embodied in the certificate, without the questions and answers being preserved as given by the witness, then it is not admissible.